# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOEL NEWMAN, Derivatively on Behalf of INTEGRAL AD SCIENCE HOLDING CORP., | Case No. |
| Plaintiff, | **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** |
| v. | |
| LISA UTZSCHNEIDER, TANIA SECOR, ROD ALIABADI, OTTO BERKES, MICHAEL FOSNAUGH, BRIDGETTE HELLER, CHRSTINA LEMA, BROOKE NAKATSUKASA, JILL PUTMAN, and MARTIN TAYLOR, | <u>**JURY TRIAL DEMANDED**</u> |
| Defendants, | |
| -and- | |
| INTEGRAL AD SCIENCE HOLDING CORP., | |
| Nominal Defendant. | |

Plaintiff Joel Newman ("**Plaintiff**"), by his attorneys, derivatively on behalf of nominal defendant Integral Ad Science Holding Corp. ("**IAS**" or the "**Company**"), submits this Verified Stockholder Derivative Complaint against individual defendants Lisa Utzschneider, Tania Secor, Rod Aliabadi, Otto Berkes, Michael Fosnaugh, Bridgette Heller, Christina Lema, Brooke Nakatsukasa, Jill Putman, and Martin Taylor (collectively, the "**Individual Defendants**") for breaches of fiduciary duties as directors and/or officers of IAS, unjust enrichment, and violations of Sections 10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934 (the "**Exchange Act**"). Plaintiff's allegations are based on his personal knowledge as to himself and his own acts and upon information and belief as to all other matters, the basis of which includes, *inter alia*, the

investigation of Plaintiff's counsel and their review and analysis of the Company's public filings with the U.S. Securities & Exchange Commission ("**SEC**"), news reports, press releases, and other publicly available sources. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by Plaintiff on behalf of nominal defendant IAS against members of its board of directors (the "**Board**") and members of the Company's upper management. The wrongdoing alleged herein has caused substantial damage to IAS's reputation, goodwill, and standing in the business community and has exposed IAS to substantial potential liability for violations of federal securities laws and the costs associated with defending itself. The violations of the law outlined herein have damaged IAS in the form of, among other thing, millions of dollars in losses to the Company's market capitalization. This actions eeks to remedy wrongdoing committed by IAS's directors and officers from at least March 2, 2023, through February 27, 2024 (the "**Relevant Period**").

2.      IAS is a global media measurement and optimization platform that analyzes the value of digital advertising placements. The Company's offerings are designed to help advertisers optimize their ad spend and better measure consumer engagement with campaigns across platforms.

3.      Throughout the Relevant Period, the Company consistently claimed that it was seeing "increased demand across [its] product portfolio" and that its "[f]avorable pricing structure" was a key "driver[] of sustainable growth." Moreover, IAS claimed that it had won "several large multiyear deals[.]"

4.      Unbeknownst to investors, however, senior management was aware that demand had started to slow as the Company was experiencing "pricing pressure" in its ad verification and optimization businesses. As a result, IAS resorted to cutting rates when renewing and securing new contracts, leading to fee compression. Indeed, as senior management acknowledged in a May 11, 2023, non-public presentation to the Board, one of the "Top Loss Reasons" for why the Company was failing to secure new business was competitors' "Aggressive Pricing."

5.      The truth behind the Company's weakening demand began to emerge on August 3, 2023, when IAS revealed that the growth of its optimization revenue had meaningfully slowed. On this news, IAS's stock price declined $3.66 per share, or approximately 20%, from a closing price of $18.83 per share on August 3, 2023, to close at $15.17 per share on August 4, 2023.

6.      The full truth emerged on February 27, 2024, when IAS released 2023 fourth quarter results and announced lackluster revenue guidance below analysts' estimates. During an earnings call held the same day, the Company's Chief Executive Officer ("**CEO**"), Lisa Utzschneider ("**Utzschneider**"), acknowledged that the Company was "seeing more competitive pricing in measurement on a select group of large contract renewals in exchange for increased volume commitments and multi-year exclusive agreements."

7.      On this news, the price of the Company's common stock plummeted by more than 40%, dropping $7.09 per share to close at $10.01 per share on February 28, 2024.

8.      Throughout the Relevant Period, the Individual Defendants breached their fiduciary duties by issuing, causing the issuance of, and/or failing to correct materially false and/or misleading statements and omissions of material fact to the investing public. Specifically, the Individual Defendants failed to disclose that: (i) the Company was experiencing a new material trend increased competitive pricing pressures; (ii) as a result, IAS had been forced to cut prices to

compensate for weakening demand and slowing revenue growth; (iii) IAS's pricing function was no longer "favorable" and IAS could no longer drive price increases; and (iv) pricing had become a key differentiator between IAS and its competitors in efforts to renew major deals and close new deals. As a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

9.     As set forth herein, and as alleged in the ongoing federal securities class action captioned *Oklahoma Firefighters Pension and Retirement System v. Integral Ad Science Holding Corp. et al*, 1:25-cv-00847-LAK (S.D.N.Y.) (the "**Securities Class Action**"), the Company's officers and directors substantially damaged IAS by filing false and misleading statements that omitted material adverse facts.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Section 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and Section 10(b) of the Exchange Act (15 U.S.C. § 78j) and Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder by the SEC. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

11.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that would not otherwise have such jurisdiction.

12.     This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

13.     Venue is proper in this District pursuant to 28 U.S.C § 1391 because the acts and Defendants' actions have had an effect in this District, and the acts and transactions giving rise to the violations of law complained of herein, including the dissemination of false and misleading statements into this District, occurred in part in this District. Moreover, the Company's common stock trades on The NASDAQ Stock Market LLC ("**NASDAQ**"), which is headquartered in this District.

## THE PARTIES

### Plaintiff

14.     Plaintiff is and has continuously been a stockholder of IAS during the wrongdoing complained of herein.

### Nominal Defendant

15.     Nominal Defendant IAS is a Delaware corporation with its principle executive offices located at 12 E. 49th Street, 20th Floor, New York, NY 10017. Since the Company's initial public offering ("**IPO**") in June 2021, the Company's shares have traded on the NASDAQ under the ticker symbol "IAS." Prior to the IPO, in June 2018, IAS sold a majority stake in the Company to Vista Equity Partners Management, LLC ("**Vista**"). Vista made its investment in IAS through several affiliated funds ultimately controlled by Vista Equity Partners Management, LLC, including Vista Equity Partners Fund VI, L.P.; Vista Equity Partners Fund VI-A, L.P.; and VEPF VI FAF, L.P.

### Officer Defendants

16.     Defendant Utzschneider has served as a member of the Board and as the Company's CEO since January 2019. As set forth in the proxy statement filed by IAS with the SEC on April 3, 2024 (the "**2024 Proxy**"), Utzschneider received $10,033,878 in compensation from the

Company in 2023. Defendant Utzschneider is also named as a defendant in the Securities Class Action.

17.     Defendant Jill Putman ("**Putman**") has served as a member of the Board since June 2021 and as the Company's Interim Chief Financial Officer ("**CFO**") since January 2025. In connection with her appointment as Interim CFO, Putman stepped down from her position as a member and the Chair of the Board's Audit Committee. Putman served as the CFO of Jamf Holding Corp. (a Vista portfolio company) from 2014 until September 2022. According to the 2024 Proxy, Putman received $269,994 in compensation from the Company in 2023.

### Former Officer Defendants

18.     Defendant Tania Secor ("**Secor**") served as the Company's CFO from 2022 until January 3, 2025, when the Company announced her departure. According to the 2024 Proxy, Secor received $5,958,083 in compensation from the Company in 2023. Defendant Secor is also named as a defendant in the Securities Class Action.

### Director Defendants

19.     Defendant Rod Aliabadi ("**Aliabadi**") has served as a member of the Board since June 2018. Defendant Aliabadi also serves as Chair of the Board's Compensation and Nominating Committee. Aliabadi is a Managing Director at Vista and sits on the Flagship Funds' Investment Committee.

20.     Defendant Otto Berkes ("**Berkes**") has served as a member of the Board since August 2020. Defendant Berkes also serves as a member of the Board's Audit Committee. According to the 2024 Proxy, Berkes received $249,994 in compensation from the Company in 2023.

21.     Defendant Mike Fosnaugh ("**Fosnaugh**") has served as a member of the Board since June 2018 and currently serves as the Chair of the Board. Fosnaugh is a Senior Managing Director at Vista, where he is also Co-Head of the Flagship Fund and sits on its Investment Committee. Fosnaugh also serves as a member of Vista's Executive Committee, Vista's governing and decision-making body for all matters affecting its overall management and strategic direction, and Vista's Private Equity Management Committee, the decision-making body for matters affecting Vista's overall private equity platform. Fosnaugh has also served as a director of Jamf Holding Corp since 2017.

22.     Defendant Bridgette Heller ("**Heller**") has served as a member of the Board since May 2021. Defendant Heller also serves as a member of the Board's Audit Committee. According to the 2024 Proxy, Heller received $249,994 in compensation from the Company in 2023.

23.     Defendant Christina Lema ("**Lema**") has served as a member of the Board since June 2021. Defendant Lema joined Vista in February 2012 and currently serves as Managing Director, Deputy Chief Legal Officer and General Counsel. Lema also serves as a member of Vista's Private Equity Management Committee. Lema has also served as a director of Jamf Holding Corp. since 2020.

24.     Defendant Brooke Nakatsukasa ("**Nakatsukasa**") has served as a member of the Board since December 2020. Defendant Nakatsukasa also serves as a member of the Board's Compensation and Nominating Committee. Nakatsukasa currently is a Vice President, Private Equity on Vista's Flagship team, which reportedly partners with upper middle-market and large-cap enterprise software, data, and technology-enabled solutions companies.

25.     Defendant Martin Taylor ("**Taylor**") has served as a member of the Board since June 2018. Defendant Taylor also serves as a member of the Board's Compensation and

Nominating Committee. Taylor is Vista's Co-Head of the Foundation Funds and sits on its Investment Committee. Taylor also serves as a member of Vista's Executive Committee and Vista's Private Equity Management Committee. Taylor has also served as a director of Jamf Holding Corp. since 2017.

26.     The Individual Defendants, because of their positions with IAS, possessed the power and authority to control the contents of IAS's reports to the SEC, press releases, and presentations to investors and analysts. Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance, and each had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to the Company's confidential information, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and/or misleading.

*Relevant Non-Parties*

27.     Robert Lord ("**Lord**") has served as a Company director since August 2024.

## <u>SUBSTANTIVE ALLEGATIONS</u>

*Background*

28.     IAS creates products for agencies and marketers, programmatic players and media sellers designed to help publishers globally deliver ad inventory that is fraud free, viewable, brand safe and suitable, and geographically targeted. The Company measures revenue from three distinct channels: (i) Optimization revenue, formerly referred to as "programmatic" revenue; (ii) Measurement revenue; and (iii) Publisher revenue.

29.     IAS generates revenue by charging a cost per thousand quality impressions ("**CPM**") based on the volume of purchased digital ads that it analyzes for advertiser and publisher customers, including customers that utilize IAS's integration partners for their ad campaigns.

30.     The Company's Optimization channel comprises its pre-bid solutions designed to help optimize return on ad spend by directing budgets to the most effective inventory. For the year ended 2024, IAS's Optimization revenue of $242.6 million represented approximately 46% of the Company's total revenue.

***The Individual Defendants' False and Misleading Statements***

31.     On March 2, 2023, IAS issued a press release announcing results for the fourth quarter and full year ended December 31, 2022. The press release provided, in relevant part:

> "We reported positive fourth quarter results with growth across all business lines," said Lisa Utzschneider, CEO of IAS. "We are off to a solid start to 2023 and expect full-year, double-digit revenue growth as we drive customer adoption of our industry-leading products."
>
> *             *             *
>
> **Fourth Quarter 2022 Financial Highlights**
>
> - **Total revenue** was $117.4 million, a 15% increase compared to $102.5 million in the prior-year period.
>
> - **Programmatic revenue** was $55.1 million, a 30% increase compared to $42.3 million in the prior-year period.
>
> - **Advertiser direct revenue** was $44.7 million, a 2% increase compared to $43.9 million in the prior-year period.
>
> - **Supply side revenue** was $17.6 million, a 9% increase compared to $16.2 million in the prior-year period.
>
> *             *             *
>
> **Financial Outlook**
>
> Tania Secor, CFO of IAS, commented, "Our 2023 financial outlook reflects our commitment to profitable growth. We expect adjusted EBITDA margin

improvement resulting from our more streamlined and efficient operations, primarily due to the restructuring in the fourth quarter. At the same time, we will continue to invest in targeted initiatives in 2023 to support our long-term growth."

IAS expects revenue and adjusted EBITDA for the first quarter and full year 2023 in the following ranges:

**First Quarter Ending March 31, 2023**:

- **Total revenue** of $102 million to $104 million

- **Adjusted EBITDA** of $29 million to $31 million

    **Year Ending December 31, 2023**:

- **Total revenue** of $453 million to $463 million

- **Adjusted EBITDA** of $141 million to $149 million

32.    That same day, the Company hosted an earnings call with analysts and investors to

discuss results. During the call, Defendant Utzschneider stated:

In 2022, we won several large multiyear deals, including JPMorgan Chase, LinkedIn, Progressive and Kimberly-Clark. Today, we are excited to announce several new competitive wins that reinforce our standing in the market as the leading provider and formidable competitor. Ford, Hershey, Bel and Kering selected IAS after extensive tech and product due diligence versus other competitors. As these are major global wins with marquee brands we'd like to walk you through why they chose to partner with IAS.

Ford selected IAS as their global ad verification partner. We expect to expand our coverage with Ford from 17 to over 50 markets, including the U.S. which has been serviced by an incumbent provider. We are proud that our robust brand safety technology continues to attract new customers.

Hershey chose IAS based on our differentiated CTV technology, campaign automation and high standard of service.

Bel, a world leader in branded cheese, including Babybel, and a major player in the healthy snacking segment, awarded IAS with a global deal. Bel was impressed by IAS' measurement capabilities, our integrations with the leading tech partners and our superior customer service.

Kering, a major worldwide luxury group with notable brands such as Gucci and Yves Saint Laurent, signed a global deal with IAS in the first quarter of 2023. We clinched this win as a result of our leadership in the luxury vertical, superior technology, integrations with Google, and exceptional client support.

*          *          *

Our products have never been more relevant as marketers lean into our differentiated solutions. IAS enables safe content to thrive which results in greater efficiency and return on ad spend for marketers and increased yields and optimization for publishers. Our model is highly differentiated as our pricing is independent of the media rates negotiated e-CPMs directly with marketers. We're a volume-based model and not immune to volatility in ad spend. However, the essential nature of our solutions provides us with some level of insulation. Building on our accomplishments in 2022, we plan to continue to innovate further on behalf of our customers with data as the foundation. Under the leadership of our new CTO, we are enhancing our tech stack for greater scale and the ability to access, process and analyze data to feel superior results for marketers. This will enable us to support future growth and innovation in high-growth areas.

In conclusion, we made tremendous strides in 2022 to position IAS for long-term success. We strengthened our leadership team, invested in high-growth areas and solidified our partnerships. We are thrilled to extend our market presence with recent logo wins, which highlights the success of our new go-to-market strategy. I am excited to unleash the potential of IAS in 2023 and beyond. We are geared up and ready to go.

33.     Also on March 2, 2023, IAS filed its annual report on Form 10-K for the period ending December 21, 2022 ("**2022 10-K**") with the SEC. The 2022 10-K was signed by Defendants Utzschneider, Secor, Aliabadi, Berkes, Fosnaugh, Heller, Lema, Nakatsukasa, Putman, and Taylor. Defendants Utzschneider and Secor each also provided signed certifications pursuant to the Sarbanes-Oxley Act of 2002 that the information contained in the 2022 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the

statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

34.    With respect to pricing pressure, the 2022 10-K stated, in relevant part:

[C]ompetitors may be better able to respond quickly to new technologies, develop deeper relationships, or offer competitive services at lower prices. Any of these developments would make it more difficult for us to sell our platform and *could result in increased pricing pressure*.

\*        \*        \*

The intense competition we face in the sales of our products and services and general economic and business conditions *could put pressure on us to change our prices*.

\*        \*        \*

Some of our competitors may bundle products for promotional purposes or as a long-term pricing strategy, commit to large customer deployments at prices that are unprofitable or provide certain guarantees. *These practices could, over time, significantly constrain the prices that we charge for certain of our offerings*. If we do not adapt our pricing models to reflect changes in customer use of our products or changes in customer demand, our revenues could decrease.[1]

35.    On March 7, 2023, Defendant Utzschneider represented IAS at the JMP Securities Technology Conference. During the conference, in response to a question of what "differentiates IAS from competitors[,]" Defendant Utzschneider stated:

Ford, Hershey, iconic brands. Few reasons why the team is putting the wins on the board and why these marketers are choosing IAS. Global footprint, we talked about that before being a big differentiator. Every single one of those four wins were a competitive RFP jump ball against our competitors. We directly won the business. All four of them, deep, deep, deep product and tech diligence. And we were able to demonstrate the sophistication of our technology and also demonstrate our investments in our product and tech. Global service, so we've been investing heavily in client service. I—

---

[1] All emphasis in quotations has been added unless otherwise indicated.

this is my third sort of macroeconomic environment in my career, living through it and marketers, they deeply care about client service, especially in down economies ROI and efficiency.

So I would say it was—it's all those reasons, and then also investments, as we talked about before in brand safety, brand suitability, and CTV.

36.     On March 8, 2023, during the Morgan Stanley Technology, Media & Telecom Conference, Defendant Utzschneider was asked by analysts, "[w]hen it comes down to the IAS offering, what are the reasons that you would highlight the most that people pick you over your competition? And in the last couple of years, is there anything you've highlighted—you would highlight that you developed that's helped to create that differentiation?" In response, Defendant Utzschneider stated:

So a couple of reasons for differentiation, and why advertisers like Ford or Hershey's are leaning in and choosing IAS. I mentioned it before, but our global footprint, IAS was in EMEA. Almost nine years ago, placed ourselves in EMEA and APAC, and we have deep roots in both regions. We've also been investing in emerging markets. So think of emerging markets like Latin America, Southeast Asia, India, Northern Europe. These global marketers like Nestlé, Coke, GlaxoSmithKline are having a broad global footprint, it really matters to the marketers because they are running their branded advertising everywhere.

So, global footprint matters. The differentiation of our product offering and technology. I would say in particular, our context control technology, the fact that we can classify content both based on semantic and sentiment or emotion, that's a big differentiator that our tech can detect things like hate speech. Our multimedia classification within the live feeds of the social platforms. TikTok, we have an incredible global partnership with TikTok. And we're now able to classify live video, image, audio. I know it's cool, and text within the live feed of TikTok. We're able to identify objects. We're able to put a timestamp on when—I don't know how many of you use TikTok, how many amounts of you use TikTok, but within these TikTok videos, we can identify the objects, time stamp it, identify brands, identify celebrities, it's incredibly cool technology, it's ML AI-based, it's getting smarter, as we go and we've just gotten started. So I'd say technology. And then, I would say the third reason is global service. I mentioned it before,

but we invested early on in global service to make sure, especially for these really large multimillion dollar accounts that we're providing high-touch service. Because they are leaning into IAS they're investing with us and they expect a level of service. So I would say those are the three reasons, global footprint, quality and accuracy of our technology, and our service.

37.     On April 10, 2023, IAS filed a proxy statement on Schedule 14A with the SEC (the "**2023 Proxy**") wherein Defendants solicited shareholder votes – in advance of an annual stockholder meeting held May 11, 2023 – in favor of proposals to (i) re-elect Defendants Berkes, Nakatsukasa, and Utzschneider as members of the Board; and (ii) ratify the appointment of PricewaterhouseCoopers LLP as the Company's independent public accounting firm for the year ending December 31, 2023.

38.     With respect to the Code of Ethics, the 2023 Proxy stated:

We have adopted a Code of Ethics that applies to all of our employees, officers and directors, including those officers responsible for financial reporting. Our Code of Ethics is available on our website. We intend to disclose any amendments to the Code of Ethics, or any waivers of its requirements that apply to our principal executive officer, principal financial officer and principal accounting officer, on our website at https://investors.integralads.com.

39.     In a section titled "Risk Oversight," the 2023 Proxy stated:

Our Board as a whole, and through its committees, has responsibility for the oversight of risk management. In this role, the Board oversees the risk management processes designed and implemented by our management to ensure such processes are adequate and functioning as designed. Additionally, the Board sets the tone at the top as it relates to the approach to enterprise-wide risk management, designed to support the achievement of organizational objectives, including capital structure and strategic objectives to improve long-term organizational performance and enhance stockholder value. A fundamental part of risk management is not only understanding the most significant risks a company faces and what steps management is taking to monitor and control those risks, but also understanding what level of risk is appropriate for any given company. The involvement of the full Board in reviewing our business and related risk

exposures is an integral aspect of its assessment of the Company's risk profile and appropriate level of risk. Our Board appreciates the evolving nature of our business and industry and is actively involved with monitoring new threats and risks as they emerge. In addition, our Board is actively involved in overseeing our management of risk enterprise by receiving detailed regular reports and engaging in discussion with members of our senior management and other personnel that include assessments and potential mitigation of the risks and exposures involved with their respective areas of responsibility.

While our full Board has overall responsibility for risk oversight, it has delegated primary oversight of certain risks to its committees. Our Audit Committee regularly monitors our major financial and security risk exposures, and the steps our management has taken to monitor and control these exposures, including guidelines and policies to govern the process by which risk assessment and management is undertaken. In addition, our Audit Committee is committed to the prevention, timely detection, and mitigation of the effects of cybersecurity threats or incidents to the Company. Our Audit Committee also monitors compliance with legal and regulatory requirements and management provides our Audit Committee periodic reports on our compliance programs.

Our Compensation and Nominating Committee oversees the design and implementation of our compensation policies and programs and monitors the incentives created by these policies and programs to determine whether they encourage excessive risk-taking. Our Compensation and Nominating Committee also assesses the relationship between risk management policies and practices and compensation, and evaluates compensation policies and practices that could mitigate any such risk. Our Compensation and Nominating Committee oversees our major corporate governance risks, including through monitoring the effectiveness of the Company's environmental, social and governance efforts. The Company has determined that any risks arising from its compensation programs and policies are not reasonably likely to have a material adverse effect on the Company. We are reviewing the final rule issued by the SEC implementing the provisions of the Dodd-Frank Wall Street Reform and Consumer Protection Act relating to recoupment of incentive-based compensation and will adopt a clawback policy when NASDAQ adopts listing standards in accordance with the final rules.

As with senior management, all committees report to the full Board as appropriate, including when a matter rises to the level of a material or enterprise level risk. We believe that the leadership structure of the Board supports effective risk management oversight.

We are committed to ensuring our Board and its committees are consistently updated on threats to our business and receive consistent updates on risk mitigation processes. At periodic meetings of our Board and its committees, management reports to and seeks guidance from our Board and its committees with respect to the most significant risks that could affect our business, such as legal risks, cybersecurity and privacy risks, and financial, tax and audit related risks.

40.     The 2023 Proxy failed to disclose that the Company was beset with compliance problems that posed significant risks of harm. The 2023 Proxy also was false and misleading because it failed to disclose that: (1) the Company lacked sufficient controls, including with respect to financial reporting; and (2) contrary to the 2023 Proxy's descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and its Committees were not adequately exercising these functions, and were causing or permitting the Company to issue false and misleading statements, and thus the Defendants on the Board breached their fiduciary duties.

41.     The 2023 Proxy further failed to disclose that: (i) the Company was experiencing a new material trend increased competitive pricing pressures; (ii) as a result, IAS had been forced to cut prices to compensate for weakening demand and slowing revenue growth; (iii) IAS's pricing function was no longer "favorable" and IAS could no longer drive price increases; and (iv) pricing had become a key differentiator between IAS and its competitors in efforts to renew major deals and close new deals.

42.    The false and misleading elements of the 2023 Proxy were material to stockholders in voting on the Board's proposals, particularly with respect to stockholders' consideration of the reelection of incumbent directors.

43.    On May 4, 2023, IAS issued a press release announcing first quarter 2023 financial results and stating, in relevant part:

> "We exceeded our first quarter outlook with increased demand across our product portfolio and benefited from several recent new customer wins," said Lisa Utzschneider, CEO of IAS. "Marketers trust IAS to measure and optimize their digital advertising spend while protecting brand safety. We are advancing our technology and platform partnerships to ensure our customers leverage actionable data in fast-growing channels."
>
> **First Quarter 2023 Financial Highlights**
>
> - **Total revenue** was $106.1 million, a 19% increase compared to $89.2 million in the prior-year period.
>
> - **Programmatic revenue** was $51.0 million, a 26% increase compared to $40.6 million in the prior-year period.
>
> - **Advertiser direct revenue** was $40.7 million, an 18% increase compared to $34.6 million in the prior-year period.
>
> - **Supply side revenue** was $14.4 million, a 2% increase compared to $14.1 million in the prior-year period.
>
> *                    *                    *
>
> **Financial Outlook**
>
> "In addition to strong top-line performance, we grew net income and adjusted EBITDA in the first quarter," said Tania Secor, CFO of IAS. "Our strong balance sheet and healthy cash flows allow us to invest in the growth of the business. We are raising our 2023 outlook to reflect our first quarter results and positive business momentum highlighted by new customer wins and expanded market opportunities."
>
> IAS is introducing the following financial outlook for the second quarter of 2023 and increasing its full year 2023 outlook for revenue and adjusted EBITDA:

**Quarter Ending June 30, 2023**:

- **Total revenue** in the range of $111 million to $113 million

- **Adjusted EBITDA** in the range of $35 million to $37 million

**Year Ending December 31, 2023**:

- **Total revenue** in the range of $457 million to $465 million

- **Adjusted EBITDA** in the range of $147 million to $153 million

44.    On June 13, 2023, during the Company's Analyst and Investor Day, Defendant Utzschneider voiced concerns over the stability of pricing, stating:

> So let's spend a couple of minutes on pricing. ***I know many of you are also very interested to hear about how our pricing works***, because we've had a lot of questions on this in some of our one-on-ones. So I wanted to put together just a very simple explanation of how our pricing works because it is actually quite simple.
>
> In terms of measurement, optimization and publisher, we charge a fixed cost per 1,000 of impressions multiplied by the number of impressions. The CPMs are fixed, we negotiate those CPMs either with the agency, the advertiser or the publisher. And our volume is variable based on industry trends and economic conditions. This approach provides us with stability and visibility into our rates, and we do not have volatility based on the media rates.
>
> Another slide on pricing. The bars in this chart represent our CPM for some of our most popular offerings. The customer journey starts with measurement. It expands to optimization. And you can see, because of the strong customer value proposition that our tech provides, we have a much higher CPM for our optimization business than we do for our measurement business. As a result, the total cart value or the cumulative CPM of our offerings can be as high as six times our measurement CPM.
>
> Now, I know you've seen the slide, both Yannis and Lisa presented it today, but I wanted to bring it up again because it's a very good framework of how to think about what's driven our revenue growth historically and what will continue to drive our revenue going forward.

Another point I'd like to make is that we have sticky and deep integrations with our platform partners. The nature of our revenue is reoccurring. And while the economic environment is a factor that influences impressions, we are well diversified across a variety of industries and we have stability from our fixed CPMs.

45.     During the same June 13, 2023, Analyst and Investor Day conference, Defendant

Secor added, in relevant part:

> To conclude, **we have a very attractive and sustainable financial profile**. And we will continue to pursue this balance of both revenue growth and profitability. You've heard today about the multiple drivers of growth for our business and how we are very well-positioned to continue to benefit from these trends. So going forward, we will focus on maintaining double-digit revenue growth and 30% plus percent EBITDA margins for the foreseeable future. And finally, we expect to continue to generate very strong free cash flow to continue to enhance our already strong balance sheet.

*          *          *

> I would say to that, … with the fixed CPMs that we have across our offerings, we do benefit when we see big spikes in volume like we did in the first quarter. Our measurement volume was up 29%. At the same time, especially given all of the different offerings we have across the different markets, **we also have a very strong pricing function** and we always look for opportunity to look at where there could be opportunity, especially given the value that our tech provides and the customer value proposition for the customer.

46.     During the Analyst and Investor Day, one analyst asked "How are customer conversations going around price elasticity or like elasticity… ? And so how are they thinking about the price as part of this whole equation?" Another analyst inquired "When was the last time you guys have actually increased your prices?" In response, Defendant Utzschneider stated: "as the world continues to shift to video, everyone knows, video, CTV demand a higher eCPM and I

19

think that will also balance out any pricing fluctuations in the ecosystem, not with us. ***We have been able to maintain price*.**"

47.    The Company also provided a presentation during the June 13, 2023, Analyst and Investors Day in which IAS attributed its "ATTRACTIVE AND SUSTAINABLE FINANCIAL PROFILE" in part to the Company's "Favorable pricing structure," which the presentation identifies as one of two "DRIVERS OF SUSTAINABLE GROWTH."

48.    On August 9, 2023, Defendant Secor represented the Company at the Oppenheimer 26th Annual Technology, Internet & Communications Conference. In response to an analyst's question asking Secor to "unpack price versus volume trends," Defendant Secor stated "Our revenue is a function it's a very simple revenue model. It's a function of price, …"

49.    The above statements were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose that: (i) the Company was experiencing a new material trend increased competitive pricing pressures; (ii) as a result, IAS had been forced to cut prices to compensate for weakening demand and slowing revenue growth; (iii) IAS's pricing function was no longer "favorable" and IAS could no longer drive price increases; and (iv) pricing had become a key differentiator between IAS and its competitors in efforts to renew major deals and close new deals. As a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

***The Truth Begins to Emerge***

50.    The truth began to emerge on August 3, 2023, when the Company issued a press release announcing second quarter 2023 financial results (the "**2Q23 Press Release**"). The 2Q23 Press Release stated, in relevant part:

"We continue to execute on our growth strategy with results for the second quarter ahead of our prior expectations," said Lisa Utzschneider, CEO of IAS. "We are leading with innovation as we scale our products to new markets with our platform partners and unlock valuable insights with increasingly actionable data. Our global business momentum continues with several new brand logos added recently."

**Second Quarter 2023 Financial Highlights**

- **Total revenue** was $113.7 million, a 13% increase compared to $100.3 million in the prior-year period.

- **Optimization revenue** (f/k/a programmatic) was $52.8 million, a 10% increase compared to $47.9 million in the prior-year period.

- **Measurement revenue** (f/k/a advertiser direct) was $44.9 million, a 23% increase compared to $36.6 million in the prior-year period.

- **Publisher revenue** (f/k/a supply side) was $15.9 million, a 1% increase compared to $15.8 million in the prior-year period.

*      *      *

**Financial Outlook**

"Our financial performance in the second quarter reflects our ability to meet our customers' needs with diverse offerings across the digital media ecosystem," said Tania Secor, CFO of IAS. "We expanded our margins during the quarter while investing in key growth areas. We continued to generate strong cash flow, which enabled us to pay down $20 million of debt in the period. We are on track to deliver a healthy mix of revenue growth and profitability for the full year."

IAS is introducing the following financial outlook for the third quarter of 2023 and increasing the midpoint of its full year 2023 outlook for revenue and adjusted EBITDA:

**Third Quarter Ending September 30, 2023**:

- **Total revenue** of $112 million to $114 million

- **Adjusted EBITDA** of $35 million to $37 million

**Year Ending December 31, 2023**:

- **Total revenue** of $459 million to $465 million

- **Adjusted EBITDA** of $149 million to $153 million

51.    While the Company's Optimization revenue increased 10% year-over-year ("**YoY**"), this represented a substantial decline over every previous fiscal quarter reported since the Company's went public in June 2021. YoY Optimization revenue growth in the previous quarter, for instance, was 26%, while second quarter 2022 YoY Optimization revenue growth was 53%.

52.    During an earnings call with analysts and investors held the same day, Defendant Secor attributed the decline in optimization growth to factors other than pricing pressure:

> Optimization revenue formerly known as programmatic revenue grew 10% year-over-year in the second quarter to $52.8 million. Optimization revenue growth in the period reflects ***maturing context-controlled growth*** in line with our prior expectations, the contribution from new logo wins, and strength in the CPG vertical, partially ***offset by slower demand from tech/telco clients.*** We are investing in optimization to drive continued adoption of our offerings. We are enhancing both our product capabilities and go-to-market engine.

53.    During the same call, Defendant Utzschneider acknowledged the "slight" decline in CPM in the Optimization segment but stated that IAS did not expect that trend to continue. Specifically, Defendant Utzschneider stated:

> [I]n the second quarter, we were really pleased to see optimization volumes continuing at Q1 levels of 14%. We did see ***a slight decline*** in the average CPM for the period, and it is an average, and that will reflect -- average is a reflection of shifts in our product mix, shifts in our customers. And that can fluctuate from quarter-to-quarter, and ***we do not expect that trend to continue on optimization***. But, turning over to measurement, we were pleased for the measurement average CPM for the quarter. The uptick, which was a reversal of what we saw in the first quarter, of down 6%, and that reflects the increase in video we reached a -- 50% of our measurement revenue was video-related. And as you all know, video is a premium to display, and that's what drove up the CPM in the second quarter on the measurement side.

54.     Following this news, on August 4, 2023, IAS's stock price declined $3.66 per share, or approximately 20%, from a closing price of $18.83 per share on August 3, 2023, to $15.17 per share on August 4, 2023.

55.     On September 8, 2023, Defendant Secor represented the Company at the 2023 Citi Global Technology Conference. In response to an analyst's question on the "broader pricing leverage in the platform and ... the effect of pricing and what that means across[,]" Defendant Secor stated:

> We have a really compelling business model and you see it in our strong net revenue retention, which was 115% in the second quarter. And what's driving that is the customer journey typically starts with measurement. Our pricing on measurement is at a certain level. And then as the customer expands into our products, particularly on the optimization side, which has a much higher CPM, there's an opportunity to drive velocity in our pricing of up to 5 to 6 times as the customer goes on that journey. So a lot of our revenue growth is driven by internal adoption.
>
> ***And what we're finding too is that our pricing, when the tech is there and we have such a strong customer value proposition, our pricing is higher***. And as the customer moves along that journey, they really value that value proposition and the enhancements that our tech solutions are driving on their digital media spend, and we're able to capture that price and you can see that in our uplift as customers expand revenue within our product suite.

56.     On December 5, 2023, Defendant Secor represented the Company at the Raymond James TMT and Consumer Conference. In response to an analyst's question concerning "the environment for pricing[,]" Defendant Secor stated:

> We enter into one- to three-year contracts with our clients and these are exclusive many times global contracts where we negotiate a CPM with these clients. These are fixed CPMs. But at times when we're introducing new technology like TMQ, ***we're able to drive a bit of a price increase***.
>
> Now, we're really focused on volume. We were really pleased in the third quarter to see our volume acceleration from the second quarter. So, volume growth across measurement and optimization were 25% and 19%

respectively, which was up from the second quarter. And we did that **while pricing was still consistent** and so pleased to see that dynamic.

57.    The statements detailed above in the 2Q23 Press Release and at the 2023 Citi Global Technology Conference and Raymond James TMT and Consumer Conference were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose that: (i) IAS was experiencing a new material trend increased competitive pricing pressures; (ii) as a result, IAS had been forced to cut prices to compensate for weakening demand and slowing revenue growth; (iii) IAS's pricing function was no longer "favorable" and IAS could no longer drive price increases; and (iv) pricing had become a key differentiator between IAS and its competitors in efforts to renew major deals and close new deals. As a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

***The Truth is Fully Revealed***

58.    The truth was fully revealed on February 27, 2024, when IAS announced fourth quarter and full year ended December 31, 2023, financial results. The Company also reported disappointing revenue guidance for the first quarter of 2024 of "$111 million to $113 million," below analyst expectations. Revenue guidance of "$530 million to $540 million," for the full year 2024 was similarly below analyst estimates.

59.    Also on February 27, 2024, during a conference call with analysts and investors, Defendant Utzschneider revealed:

> Our business today is weighted towards a loyal base of large advertising customers with an average tenure of over eight years for our top 100 marketers. At the end of the fourth quarter, we had 222 large advertising customers with annual spend of at least $200,000 per year.

Revenue from these large advertising customers represented 87% of our total advertising revenue for the trailing twelve-month period. *We are seeing more competitive pricing and measurement on a select group of large contract renewals in exchange for increased volume commitments and multi-year exclusive agreements. We have factored this dynamic into our growth outlook for 2024*.

60.    During the same February 27, 2024, call, Defendant Secor stated:

[O]ur first quarter outlook reflects **more competitive pricing** and measurement on a select group of large contract renewals in exchange for increased volume commitments and multi-year exclusive agreements. We have also factored into our Q1 outlook the implementation of previously negotiated pricing by one optimization account.

61.    During the question-and-answer portion of the call, Defendant Utzschneider engaged in the following exchange with one analyst:

*Analyst*: I was hoping maybe you could expand a little bit on the pricing pressure that you're seeing beyond what you said in the prepared remarks. I guess, can we expect that to continue and be something that is a headwind throughout the year? I know you gave us full year guidance, but I guess what's the right way to think about that? And then second, I guess, just Q1, the growth rate, pretty big decel and then the second half, or I guess the remaining three quarters, a pretty nice uptick to get you to the full year, I guess. What are the moving pieces that should reaccelerate the growth beyond Q1?

*Defendant Utzschneider*: ***So, in terms of competitive pricing dynamics that we're seeing, as we mentioned in the script, we offered more competitive pricing*** and measurement on a select group of large contract renewals in exchange for volume commitments and multiyear exclusive agreements. The way to think about that is, yes, we were facing those competitive dynamics, but we thought it was the strategic thing to do is to ensure that we renew these large accounts and ensure that they drive up volume. Also, our strategy has been to secure measurement renewals so that we can upsell and cross-sell our offerings, expand geographies and ramp over time.

62.    On February 28, 2024, in response to this news, the Company's stock price declined $7.09, or approximately 41%, to $10.01 per share from the previous day's close of $17.10 per share.

***Additional Revelations Following the Relevant Period***

63.    On November 1, 2024, a Public [Redacted] Verified Stockholder Derivative Complaint (the "**Delaware Chancery Complaint**") was filed in the Court of Chancery of the State of Delaware against Vista and certain of IAS directors affiliated with Vista: Aliabadi, Fosnaugh, Lema, Nakatsukasa and Taylor. The Delaware Chancery Complaint states that the allegations therein are based upon a review of documents obtained from the Company through a books and records demand made pursuant to 8 *Del. C.* § 220.

64.    The Delaware Chancery Complaint alleges, among other things:

> Through its presence in the boardroom, Vista learned, beginning in February 2023, that IAS's revenue growth had started to slow. In consecutive quarterly Board meetings in February 2023 and May 2023, Vista's representatives and handpicked directors learned that IAS was experiencing "pricing pressure" in its ad verification and optimization businesses, and that the Company had resorted to cutting rates to win "marquis [sic] customers." As IAS management contemporaneously recognized, the Company heavily relies on maintaining a "[f]avorable pricing structure" as a key "driver[] of sustainable growth." Analysts likewise recognized that pricing is critical to the IAS's success and thus were "very interested to hear about how [the Company's] pricing works."

65.    With respect to the February 2023 Board meeting, for instance, the Delaware Chancery Complaint alleges that "the Board was expressly told that the Company faced pricing pressures." According to the Delaware Chancery Complaint, a slide redacted in the complaint showed that "in order to win 'marquis [sic] customers," the Company resorted to cutting rates charged when renewing and securing new contracts, leading to fee compression[.]"

66.     Similarly, the Delaware Chancery Complaint alleges, with respect to a May 2023 Board meeting:

> For instance, on May 11, 2023, the Board held a "CEO Session" during a meeting attended by Director Defendants Fosnaugh, Lema, and Nakatsukasa, and Vista representative and Head of Equity Capital Markets Ashley MacNeill. Through this "CEO Session," the Board learned that one of the "lowlights" of the "state of the business" was "increased customer pressure to prove Programmatic [i.e., optimization] value vs. agency or free alternatives." The Board also learned in a finance presentation made during this meeting that another "lowlight" was "continued pricing pressure to win marquis [sic] customers and focus on ROI and efficiency leading clients to look at lower-priced / free programmatic [i.e., optimization] solutions." Indeed, one of the "Top Loss Reasons" for why the Company was failing to secure new business was competitors' "Aggressive Pricing."[2]

67.     The Delaware Chancery Complaint alleges, in relevant part, with respect to an August 1, 2023, Board meeting:

> On August 1, 2023, the Board met with Aliabadi, Fosnaugh, Lema, Nakatsukasa, and Taylor in attendance, among others. Materials distributed to the Board in advance of the meeting confirmed that the Company experienced "lower than expected Optimization growth[,]" noting that it "expect[ed] this trend to continue." Revenue results from the first half of 2023 showed that "Optimization growth of 26% [in] Q1 slow[ed] to 10% [in] Q2[,] driven by slowdown of Context Control [REDACTED]" Pricing concerns were also highlighted, stating that [REDACTED] and that there was "[c]ontinued [c]ompetition in Programmatic" because "[a]dvertisers are increasingly cost conscious due to macroeconomic conditions[.]

68.     The Delaware Chancery Complaint alleges, in relevant part, with respect to a November 9, 2023, Board meeting:

> On November 9, 2023, the Board met and reviewed a preliminary forecast for 2024, or "Preliminary 2024 AOP [Annual Operating Plan]." This meeting was attended by the full Board, including Director Defendants

---

[2] Internal footnotes in the Delaware Chancery Complaint have been omitted.

Fosnaugh, Aliabadi, Lema, Nakatsukasa, and Taylor, as well as Vista representative and Head of Equity Capital Markets Ashley MacNeill.

During this meeting, as part of the "Executive Summary" of the projections, the Board learned that "[t]he competitive pricing environment has accelerated in the past few months and [is] expected to negatively impact 2024."

69.     Accordingly, before and during the Relevant Period, the Individual Defendants were aware of "continued pricing pressure" to win customers and that, as a result, IAS resorted to cutting rates charged when renewing and securing new contracts.

## FIDUCIARY DUTIES

70.     Because of their positions as officers and directors of the Company, each of the Individual Defendants owed and continues to owe IAS and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care and was/is required to use his/her utmost ability to control and manage IAS in a fair, just, honest, and equitable manner. The Individual Defendants were/are required to act in furtherance of the best interests of IAS and its stockholders to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

71.     Each Individual Defendant owed and continues to owe IAS, and its stockholders, the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and the use and preservation of its property and assets.

72.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of IAS, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their executive and/or directorial positions with IAS, each of the Individual Defendants had knowledge of material, nonpublic information regarding the Company. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful

information regarding the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls so that the market price of the Company's stock would be based on truthful and accurate information.

73.    To discharge their duties, the Individual Defendants were/are required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. The Individual Defendants were required to, among other things:

(a)    Ensure that the Company complied with its legal obligations and requirements—including requirements involving the filing of accurate financial and operational information with the SEC—and refrain from engaging in insider trading and other deceptive conduct;

(b)    Ensure that the Company was operated in a diligent, honest, and prudent manner under the laws and regulations of Delaware and the United States pursuant to the Company's Codes of Ethics;

(c)    Conduct the affairs of the Company in compliance with all applicable laws, rules, and regulations to make it possible to provide the highest quality performance of its business, avoid wasting the Company's assets, and maximize the value of the Company's stock;

(d)    Remain informed as to how IAS conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make a reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws;

(e)    Establish and maintain systematic and accurate records and reports on the business and internal affairs of IAS, as well as procedures for reporting said reports and records to

the Board, and periodically investigate, or cause independent investigation to be made of, said reports and records;

(f)     Maintain and implement an adequately functioning system of internal, legal, financial, and management controls such that IAS's operations comply with all applicable laws and that the Company's financial statements and regulatory filings filed with the SEC and disseminated to the public and Company's shareholders are accurate;

(g)     Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports of information that the Company was required by law to disseminate;

(h)     Examine and evaluate any reports of examination, audits, or other information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above; and

(i)     Truthfully and accurately guide investors and analysts as to the Company's business operations at any given time.

74.     At all times relevant hereto, the Individual Defendants were the agents of each other and of IAS and were at all times acting within the scope of such agency.

### *Duties Pursuant to the Company's Codes of Ethics*

75.     The Individual Defendants, as officers and/or directors of IAS, were bound by the Company's Code of Ethics, which states that its purpose is to deter wrongdoing and promote:

> 1. honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;
>
> 2. full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission (the 'SEC') and in other public communications made by the Company;

    3. Compliance with applicable governmental laws, rules and regulations;

    4. The prompt internal reporting of violations of the Code to an appropriate person or persons identified in the Code; and

    5. accountability for adherence to the Code.

76.    All Company directors, officers, and employees are required to be familiar with the Code of Ethics, comply with its provisions, and report suspected violations.

77.    In a section titled "Honest and Ethical Conduct," the Code of Ethics states that the Company's policy is "to exhibit and promote high standards of integrity by conducting its affairs honestly and ethically." Specifically, the Code of Ethics states:

> Each director, officer and employee must act with integrity and observe the highest ethical standards of business conduct in his or her dealings with the Company's customers, suppliers, partners, service providers, competitors, employees and anyone else with whom he or she has contact in the course of performing his or her job and must act in good faith, responsibly, with due care, competence and diligence, without misrepresenting material facts or allowing their independent judgment to be subordinated.

78.    With respect to "Fair Dealing," the Code of Ethics states, in relevant part, that no director, officer, or employee "should take unfair advantage of anyone through manipulation, concealment, abuse, or privileged information, misrepresentation of facts or any other unfair dealing practice."

79.    In a section titled "Compliance," the Code of Ethics states, in relevant part, that directors, officers and employees "should comply both in letter and spirit, with all applicable laws, rules and regulations in the cities, states and countries in which the Company operates." The Code of Ethics further provides that "[i]nsider trading is unethical, illegal and a violation of the Company's Insider Trading Policy."

80.    In a section titled "Disclosure," the Code of Ethics states:

The Company's periodic reports and other documents filed with, or furnished to, the SEC and other regulators, including all financial statements and other financial information, along with other public communications made by the Company, must comply with applicable federal securities laws and SEC rules.

Each director, officer and employee who contributes in any way to the preparation or verification of the Company's financial statements and other financial information must ensure that the Company's books, records and accounts are accurately maintained. Each director, officer and employee must cooperate fully with the Company's accounting and internal audit departments, as well as the Company's independent public accountants and counsel.

Each director, officer and employee who is involved in the Company's disclosure process must:

1)  be familiar with and comply with the Company's disclosure controls and procedures and its internal control over financial reporting; and

2)  take all necessary steps to ensure that all filings with the SEC and all other public communications about the financial and business condition of the Company provide full, fair, accurate, timely and understandable disclosure.

81.    With respect to enforcement of the Code of Ethics, the Code of Ethics provides, in relevant part:

Upon receipt of a determination that there has been a violation of this Code, the Board, the Chair of the Audit Committee, or the head of Human Resources in consultation with the General Counsel will take such preventative or disciplinary action as it deems appropriate, including, but not limited to, reassignment, demotion, dismissal and, in the event of criminal conduct or other serious violations of the law, notification of appropriate governmental authorities.

82.    The Company also has a separate Code of Ethics for Senior Financial Officers (the "**Officers' Code of Ethics**"), which applies to the CEO, CFO, the principal accounting officer, the controller, and all persons performing similar functions (collectively, the "**Senior Financial**

**Officers**," *i.e.,* Defendants Utzschneider, Secor, and Putman). In addition to abiding by the Code of Ethics, each Senior Financial Officer is required to sign an annual certification attesting to his or her compliance with the Officers' Code of Ethics.

83.     The Officers' Code of Ethics provides, in relevant part:

> Each Senior Financial Officer shall exhibit and promote the highest standards of honesty and ethical business conduct, including acting in good faith, responsibly, with due care, competence and diligence, without misrepresenting material facts (including omissions of material facts) or allowing their independent judgment to be subordinated. Each Senior Financial Officer shall establish, maintain and support policies and procedures that encourage and reward professional integrity in all aspects of the Company's organization and shall ensure an environment exists within the Company that eliminates inhibitions and barriers to responsible behavior, such as coercion, fear of reprisal or alienation from other employees within the Company.

84.     With respect to the Company's public reporting controls and compliance with reporting and securities laws and regulations, the Officers' Code of Ethics states, in relevant part:

> II. Each Senior Financial Officer is responsible for full, fair, accurate, timely and understandable disclosure in the reports and documents that the Company files with, or furnishes to, the Securities and Exchange Commission (the 'SEC') and other regulators, and in other public communications made by the Company. Accordingly, it is the responsibility of each Senior Financial Officer to (a) promptly bring to the attention of the General Counsel or the Audit Committee any material information of which he or she may become aware that affects the disclosures made by the Company in its SEC filings and public communications and (b) otherwise assist the General Counsel or the Audit Committee, as applicable and as necessary, in fulfilling the responsibilities specified in the Company's policies and procedures regarding financial reporting and disclosure.

> III. Each Senior Financial Officer shall promptly bring to the attention of the General Counsel or the Audit Committee any information he or she may have concerning (a) significant deficiencies or material weaknesses in the design or operation of internal controls, which could adversely affect the Company's ability to record, process, summarize and report financial

information in the time frames prescribed by the rules of the Securities Exchange Act of 1934, or (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls.

*        *        *

V. Each Senior Financial Officer shall endeavor to comply with all securities and other laws, rules and regulations of federal, state and local governments and other private and public regulatory authorities that are applicable to the Company and its operations. Each Senior Financial Officer shall promptly bring to the attention of the General Counsel or the Audit Committee any information he or she may have concerning evidence of a violation of the securities or other laws, rules or regulations applicable to the Company and the operation of its business, or of a violation of the Code of Ethics or of a violation of this Code.

***Duties Pursuant to the Audit Committee Charter***

85.    In addition to the duties set forth in the Codes of Ethics, Defendants Berkes, Heller, and Putman (the "**Audit Committee Defendants**"), who served on the Audit Committee during the Relevant Period, owed specific duties to IAS pursuant to the Audit Committee Charter. Specifically, the Audit Committee Charter states that the purpose of the Audit Committee is "to assist the Board in fulfilling its statutory and fiduciary oversight responsibilities relating to IAS' financial accounting, reporting and controls." Accordingly, the principal functions of the Audit Committee are to assist the Board in its oversight of:

- the integrity of accounting and financial reporting processes of IAS and the audits of the financial statements of IAS;
- the periodic reviews of the adequacy of the accounting and financial reporting processes and systems of internal control that are conducted by IAS' independent auditor (the "Independent Auditor") and IAS' financial and senior management;
- the qualifications, independence and performance of the Independent Auditor;
- risk assessment and risk management;
- the performance of IAS' internal audit function; and

- compliance by IAS with legal and regulatory requirements.

86.    In a section titled "Responsibilities and Duties, the Audit Committee Charter states, in relevant part, that the Audit Committee has the following duties and responsibilities with respect to "Financial Statements and Disclosures":

1. Review with management and the Independent Auditor IAS' quarterly and annual financial statements, as well as analyses prepared by management or the Independent Auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements.

                    *            *                *

4. In connection with the Committee's review of the annual audited financial statements:

   - Discuss with the Independent Auditor and management the financial statements (including the related notes) and the results of the Independent Auditor's audit of the financial statements;

   - Discuss any items required to be communicated by the Independent Auditor in accordance with the applicable requirements of the Public Company Accounting Oversight Board(the "PCAOB").These discussions should include an overview of the planned scope and timing of the audit, the Independent Auditor's judgments about the quality and appropriateness of IAS' accounting principles, the reasonableness of significant judgments, the clarity of the disclosures in IAS' financial statements, the representations the Independent Auditor are requesting from IAS' management, any significant difficulties encountered during the course of the audit, including any restrictions on the scope of work or access to required information;

   - Discuss with IAS' management and the Independent Auditor IAS' selection, application and disclosure of critical accounting policies and practices;

   - Review with the Independent Auditor the form of audit opinion to be issued by the Independent Auditor on the financial statements and notes thereto; and

   - Review IAS' specific disclosure under Management's Discussion and Analysis of Financial Condition and Operation.

5. Recommend to the Board whether the annual audited financial statements (including the related notes) should be included in IAS' Annual Report on Form 10-K or should otherwise by approved.

6. In connection with the Committee's review of the quarterly financial statements:

- Discuss with the Independent Auditor and IAS' management the results of the Independent Auditor's SAS No. 100, Interim Financial Information (Codification of Statements on Auditing Standards, AU § 722) or similar review of the quarterly financial statements;

- Discuss significant issues, events and transactions and any significant changes regarding accounting principles, practices, policies, judgments or estimates with IAS' management and the Independent Auditor; and

- Review IAS' specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations.

7. Review and discuss with management and the Independent Auditor IAS' earnings press releases, including the type of information to be included and its presentation and the use of any pro forma, adjusted or other non-GAAP financial information as well as key performance indicators disclosed by IAS; and any financial information and earnings guidance provided to analysts and ratings agencies, including the type of information to be disclosed and type of presentation to be made, paying particular attention to the use of "proforma" or "adjusted" nonGAAP information, as well as key performance indicators disclosed by IAS. Such discussions may be general (consisting of discussing the types of information to be disclosed and the types of presentations to be made), provided that each earnings release or each instance in which IAS provides earnings guidance need not be discussed in advance.

8. Review with management and the Independent Auditor:

- Any major issues regarding accounting principles and financial statement presentations, including any significant changes in IAS' selection or application of accounting principles;

- The effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on IAS' financial statements;

- Consideration of the judgment of both management and the Independent Auditor about the quality, not just the acceptability, of accounting principles; and

- The completeness and clarity of the disclosures in the financial statements.

9. Discuss with the Independent Auditor material issues on which the national office of the independent auditor was consulted by IAS' audit team.

87.     With respect to "Internal Controls," the Audit Committee's functions and responsibilities include, in relevant part:

> 10.    Periodically discuss with IAS' principal accounting officer and principal in-house legal counsel the function of IAS' disclosure controls and procedures and any disclosure committee that may be established by IAS. Discuss with IAS' Chief Executive Officer and Chief Financial Officer their conclusions regarding the effectiveness of IAS' disclosure controls and procedures and the required management certifications to be included in or attached as exhibits to IAS' Annual Report on Form 10-K or Quarterly Report on Form 10-Q, as applicable.

> 11.    Review and discuss with the Independent Auditor and IAS' management their periodic reviews of the adequacy of IAS' accounting and financial reporting processes and systems of internal control, including any significant deficiencies, material weaknesses or other major deficiencies in their design or operation, any material changes in such processes and systems, and any special audit steps or changes adopted in light of any material control deficiencies. Review and discuss with management controls regarding non-GAAP financial information and key performance indicators disclosed by IAS.

> 12.    Review any allegations of fraud involving management or any employee of IAS with a significant role in IAS' internal controls over financial reporting that are disclosed to the Committee.

88.     While the Audit Committee was responsible for ensuring that the Company had adequate internal controls regarding the accuracy of the Company's financial disclosures and the Company's communications with the public, it failed to fulfill this responsibility. In fact, the Audit Committee Defendants harmed the Company by taking part in the publishing of false and misleading statements and/or omissions of material fact described herein.

## **BREACHES OF DUTIES**

89.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and/or directors of IAS, the absence of good faith on their part, and a reckless disregard for their duties to the Company.

90.     The Individual Defendants breached their duty of loyalty and good faith by allowing the Company to cause, or by themselves causing, the Company to make improper

statements to the public and the Company's stockholders. These unlawful practices wasted the Company's assets and caused IAS substantial damage.

91.     The Audit Committee Defendants had a duty to review the Company's earnings press releases and regulatory filings. The Audit Committee Defendants breached their duty of loyalty and good faith by approving the omission of material information, making improper statements detailed herein, and failing to properly oversee IAS's public statements and internal control functions.

92.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of IAS, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. In addition, because of the Individual Defendants' improper course of conduct, the Company is now the subject of the Securities Class Action, which alleges violations of federal securities laws. As a result, IAS has expended and will continue to expend significant sums of money.

93.     Neither the safe-harbor provision of the Private Securities Litigation Reform Act of 1995 ("**PSLRA**") nor the judicially created "bespeaks caution" doctrine applicable to forward-looking statements under certain circumstances applies to any of the false or misleading statements pleaded herein. None of the subject statements constituted a forward-looking statement; rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made.

94.     Alternatively, to the extent any of the false or misleading statements pleaded herein could be construed as forward-looking statements, they were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially

from those in the purportedly forward-looking statements. Further, to the extent the PSLRA's safe harbor would otherwise apply to any forward-looking statements pleaded herein, because, at the time each such statement was made, the speaker(s) knew the statement was false or misleading, or the statement was authorized and/or approved by an executive officer of IAS or an Individual Defendant who knew that the statement was materially false or misleading when made. None of the historic or present tense statements made by the Individual Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or state of future economic performance when made, nor were any of the projections or forecasts made by the Individual Defendants expressly related to, or stated to be dependent on, those historic or present tense statement when made.

## **DAMAGES TO IAS**

95.    As a direct and proximate results of the Individual Defendants' conduct, IAS has expended and will continue to expend significant sums of money.

96.    Such expenditures include, but are not limited to, legal fees associated with the aforementioned Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection therewith. Furthermore, the Securities Class Action has exposed the Company to massive class-wide liability.

97.    Moreover, the Company has provided significant compensation and benefits to Individual Defendants who breached their fiduciary duties to the Company.

98.    As a result of the Individual Defendants' conduct, IAS has suffered and will continue to suffer a loss of reputation and goodwill and a "liar's discount" that will plague the

Company's stock price in the future due to the Company's actions and misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

99.    Plaintiff repeats and re-alleges each and every allegation above as though fully set forth herein.

100.    Plaintiff brings this action derivatively and for the benefit of IAS to redress injuries suffered, and to be suffered, because of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of IAS, unjust enrichment, and violations of Sections 10(b), 14(a), and 20(a) of the Exchange Act.

101.    IAS is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

102.    Plaintiff is, and has been continuously at all relevant times, a stockholder of IAS. Plaintiff will adequately and fairly represent the interests of IAS in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

103.    A pre-suit demand on the Board of IAS is futile and, therefore, excused. At the time of filing this action, the Board consists of 10 directors: Individual Defendants (i) Utzschneider; (ii) Aliabadi; (iii) Berkes; (iv) Fosnaugh; (v) Heller; (vi) Lema; (vii) Nakatsukasa; (viii) Putman; and (ix) Taylor (collectively, the "**Director Defendants**"), as well as non-party (x) Lord (together with the Director Defendants, the "**Demand Board**"). Plaintiff needs only to allege demand futility as to half of the directors (*i.e.*, five directors) who are on the Board at the time this action is commenced.

104.    Plaintiff did not make a demand on the Demand Board prior to bringing this stockholder derivative suit because, as set forth below, a majority of the Demand Board faces a substantial likelihood of personal liability and is incapable of making an independent and disinterested decision to bring the claims herein.

105.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

106.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

107.    Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

108.    As members of the Board charged with overseeing the Company's affairs, each of the Director Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of IAS, the Director Defendants knew, or should have known, the material facts surrounding the Company's pricing pressure and declining revenue growth.

109.    Moreover, each of the nine Director Defendants signed the 2022 10-K. Defendant Utzschneider also provided signed certifications pursuant to the Sarbanes-Oxley Act of 2002 that the information contained in the 2022 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]" Accordingly, these Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile, and, therefore, excused.

110.    Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

111.    Director Defendants Berkes, Nakatsukasa, and Utzschneider also received a material personal benefit as a result of their breaches of fiduciary duties because they were re-elected to the Board based on the materially false and misleading 2023 Proxy.

112.    Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

113.    Additionally, the Director Defendants took no action to redress the harm suffered by the Company resulting from the misconduct alleged herein.

114.    Pursuant to the Audit Committee Charter, the Audit Committee Defendants were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial reporting and the underlying internal controls and procedures over financial reporting. At all relevant times, however, the Audit Committee Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business, finances, and operations, as alleged above. Therefore, the Audit Committee Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

115.    The Director Defendants, as members of the Board, were and are subject to the Company's Code of Ethics. The Code of Ethics goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to the Company's standards of business conduct. The Director Defendants violated the Code of Ethics because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Ethics, they face a substantial likelihood of liability for breaching their fiduciary duties and, therefore, demand upon them is futile.

116.    Moreover, Director Defendants Fosnaugh, Aliabadi, Lema, Nakatsukasa, and Taylor (the "**Vista Affiliated Directors**") lack independence from Vista, IAS's controlling stockholder. The Vista Affiliated Directors are dual fiduciaries who currently serve as executives for Vista and/or its affiliated funds, are actively involved in Vista's investments, and sit on the boards of Vista portfolio companies. As alleged in the Delaware Chancery Complaint, Vista sold approximately $477 million worth of Company stock while in possession of negative, material,

non-public information regarding IAS, *i.e.*, that the Company was facing pricing pressure and declining revenue growth. As a result of these sales, Vista was able to avoid approximately $269.4 million in losses due to declines in the Company's stock price once the negative information reached the public market. In allowing such, the Vista Affiliated Directors prioritized Vista's financial interests above the interests of IAS and its stockholders. Accordingly, Director Defendants Fosnaugh, Aliabadi, Lema, Nakatsukasa, and Taylor cannot give fair and disinterested consideration to a demand.

117.    Accordingly, a pre-suit demand on the Demand Board is futile and excused.

## **FIRST CLAIM**

### **Against the Individual Defendants**
*for Violations of Section 14(a) of the Exchange Act*

118.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

119.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these non-fraud claims.

120.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any

proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

121.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

122.    The 2023 Proxy failed to disclose, *inter alia*, that: (1) the Company lacked sufficient controls, including with respect to financial reporting; and (2) contrary to the 2023 Proxy's descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and its Committees were not adequately exercising these functions, and were causing or permitting the Company to issue false and misleading statements, and thus the Defendants on the Board breached their fiduciary duties.

123.    The 2023 Proxy further failed to disclose that: (i) the Company was experiencing a new material trend increased competitive pricing pressures; (ii) as a result, IAS had been forced to cut prices to compensate for weakening demand and slowing revenue growth; (iii) IAS's pricing function was no longer "favorable" and IAS could no longer drive price increases; and (iv) pricing had become a key differentiator between IAS and its competitors in efforts to renew major deals and close new deals.

124.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy was materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for stockholder determination in the 2023

Proxy, including, but not limited to, election of directors, ratification of an independent auditor, and the approval of executive compensation.

125.    The false and misleading elements of the 2023 Proxy led to the re-election of Defendants Berkes, Nakatsukasa, and Utzschneider to the Board, allowing them to continue breaching their fiduciary duties to IAS.

126.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2023 Proxy.

127.    Plaintiff, on behalf of IAS, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants
*for Violations of Section 20(a) of the Exchange Act*

128.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

129.    The Individual Defendants by virtue of their positions with IAS and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of IAS and officers and directors who made the false and misleading statements alleged herein within the meaning of Section 20(a) of the Exchange Act. The Individual Defendants had the power and influence, and exercised the same, to cause IAS to engage in the illegal conduct and practices complained of herein.

130.    Plaintiff, on behalf of IAS, has no adequate remedy at law.

### THIRD CLAIM

**Against the Individual Defendants**
*for Breach of Fiduciary Duties*

131.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

132.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of IAS's business and affairs as directors and/or officers of the Company.

133.    Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, and reasonable inquiry, causing the Company to engage in the misconduct described herein.

134.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

135.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

136.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their

fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent its publicly reported financials. These actions could not have been a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

137.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

138.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

139.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, IAS has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

140.    Plaintiff, on behalf of IAS, has no adequate remedy at law.

## <u>FOURTH CLAIM</u>

### Against the Individual Defendants
*for Unjust Enrichment*

141.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

142.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, IAS.

143.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from IAS that was tied to the performance or artificially inflated valuation of IAS, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

144.    Plaintiff, as a shareholder and a representative of IAS, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

145.    Plaintiff, on behalf of IAS, has no adequate remedy at law.

## FIFTH CLAIM

### Against the Individual Defendants
*for Violations of Section 10(b) of the Exchange Act and SEC Rule 10(b)-5*

146.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

147.    During the Relevant Period, the Individual Defendants disseminated or approved materially false and/or misleading public statements and failed to disclose, among other things, that: (1) the Company was experiencing a new material trend increased competitive pricing pressures; (2) as a result, IAS had been forced to cut prices to compensate for weakening demand and slowing revenue growth; (3) IAS's pricing function was no longer "favorable" and IAS could no longer drive price increases; and (4) pricing had become a key differentiator between IAS and its competitors in efforts to renew major deals and close new deals. As a result, positive statements

about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis. Thus, the price of the Company's shares was artificially inflated due to the deception of the Individual Defendants.

148. As alleged herein, the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding IAS, their control over, and/or receipt and/or modification of IAS's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning IAS, participated in the fraudulent scheme alleged herein.

149. The Individual Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the time in issue without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

150. The Individual Defendants were among the senior management and the directors of the Company during the Relevant Period. Based on their roles at the Company, the Individual Defendants would have been involved with, or knowledgeable about, the wrongdoing alleged herein.

151.    At a minimum, the Individual Defendants failed to review or check information that they had a duty to monitor or ignored obvious signs that their statements were materially false and misleading or contained material omissions. Given the nature and extent of the problems at the Company, the Individual Defendants knew and/or recklessly disregarded the extent and scope of their statements during the Relevant Period.

152.    Likewise, the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein.

153.    As such the Individual Defendants caused the Company to violate section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; and (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of IAS and that Plaintiff is an adequate representative of the Company;

B.    Finding that any demand upon the Board concerning the wrongdoing complained of herein would have been futile;

C.    Determining and awarding to IAS the damages sustained by it because of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre- and post-judgment interest thereon;

D.    Directing IAS and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and protect IAS and its stockholders from a repeat of the damaging events described herein;

E.    Awarding IAS restitution from the Individual Defendants;

F.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

G.    Granting such other and further relief as the Court deems just and proper.

Dated: June 2, 2025

**LEVI & KORSINSKY, LLP**

/s/ *Correy A. Suk*
Correy A. Suk
Gregory M. Nespole
Daniel Tepper
33 Whitehall Street, 17th Floor
New York, NY 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
csuk@zlk.com
gnespole@zlk.com
dtepper@zlk.com

*Counsel for Plaintiff*

## **VERIFICATION**

I, Joel Newman, do hereby verify that I am a holder of common stock of Integral Ad Science Holding Corp., and was a holder of such stock at the time of the wrongs complained of in the foregoing Verified Stockholder Derivative Complaint (the "**Complaint**"). I have reviewed and authorized the filing of the Complaint. All of the averments in the Complaint regarding me are true and correct upon my personal knowledge and, with respect to the remainder of the averments, are true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Date:   May   31   , 2025

DocuSigned by:

*Joel Newman*

1315DEBA5E2C4EC...

Joel Newman